RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0079p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

KIMALYN ROMONA CARAWAY, individually and as
next of kin of Darius Dawon Caraway, and the estate
of Darius Dawon Caraway,

　　　　　　　　　　*Plaintiff-Appellant*,

　　　*v.*

CORECIVIC OF TENNESSEE, LLC; CORECIVIC, INC.;
DAMON T. HININGER; STEVE CONRY; VINCENT
VANTELL,Warden,

　　　　　　　　　　*Defendants-Appellees*.

> No. 23-5410

───────────────

Appeal from the United States District Court for the Western District of Tennessee at Jackson.
No. 1:22-cv-01150—S. Thomas Anderson, District Judge.

Decided and Filed:  April 10, 2024

Before:  GRIFFIN, THAPAR, and NALBANDIAN, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:**  Paul Forrest Craig, Memphis, Tennessee, James Edward Blount, IV, BLOUNT
LAW FIRM, Cordova, Tennessee, for Appellant.  Nathan D. Tilly, PENTECOST, GLENN &
TILLY, PLLC, Jackson, Tennessee, for Appellees.

───────────────

**OPINION**

───────────────

　　THAPAR, Circuit Judge.  Darius Caraway overdosed in prison.  His estate sued the
prison and its officials, claiming they violated the Eighth Amendment by failing to prevent his

overdose.  The district court dismissed the estate's complaint because it failed to state a claim. We affirm.

I.

Darius Caraway was serving a murder sentence at Whiteville Correctional Facility in southwest Tennessee.  Whiteville is operated by CoreCivic, Inc.[1] under contract with the State. It houses roughly 1,500 inmates.

Late one night, Whiteville staff found Caraway unresponsive in his cell.  They rendered aid until emergency medical personnel took Caraway to the hospital, where he was pronounced dead a few minutes after arrival.  An autopsy revealed Caraway died of a fentanyl overdose.

Caraway's mother believed his death was preventable.  So on behalf of her son's estate, she sued CoreCivic and three of its officials.  The estate argued that each defendant violated Caraway's Eighth Amendment rights by failing to protect him from overdosing.  *See* 42 U.S.C. § 1983.

The estate presented the following theory:  CoreCivic deliberately understaffs Whiteville because a skeleton crew is cheaper than a full complement.  *See* R. 18, Pg. ID 105, ¶ 2 (asserting that CoreCivic is "driven by 'the power of the almighty dollar'").  Due to this understaffing, CoreCivic failed to properly screen prison guard applicants.  Those new hires then apparently smuggled in illegal drugs (namely, fentanyl).  They also failed to count and inspect the inmates and their cells as required by Tennessee law.  *Id.*, Pg. ID 113–14, ¶¶ 35–37; *id.*, Pg. ID 116, ¶ 55. This smuggling and lack of supervision allowed fentanyl to proliferate at Whiteville.  According to the estate, the defendants knew about this proliferation but did nothing about it.  Finally, the estate believes that the unchecked spread of drugs directly led to Caraway's death by overdose. Thus, the theory concludes, the individual defendants inflicted cruel and unusual punishment on Caraway by understaffing Whiteville.  *See* U.S. Const. amend. VIII.   And the corporate defendants are liable because understaffing was a matter of company policy.  *See Street v. Corr.*

---

[1]Both CoreCivic, Inc. and CoreCivic of Tennessee, LLC are defendants in this case.  But the estate's complaint draws no legally relevant distinction between them.  So we refer to them collectively as "CoreCivic."

*Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

To support this theory, the complaint relies on two audits of the Tennessee Department of Correction conducted by Tennessee's comptroller.[2]  The first audit, completed in 2017, found that Whiteville "operated with fewer staff than allowed by the approved staffing pattern." R. 18-3, Pg. ID 160.  That deficiency "may have limited [Whiteville's] ability to effectively manage the inmate population[]" it housed. *Id.*, Pg. ID 158.  "Most critical posts were staffed," the audit clarified, but overall staffing levels didn't meet Whiteville's requirements. *Id.*, Pg. ID 160.  A second audit released in 2020 revealed similar staffing shortages in CoreCivic and state prisons throughout Tennessee.

The defendants moved to dismiss the estate's complaint under Rule 12(b)(6).  Because the estate thought the defendants' motion impermissibly relied on material outside the pleadings, it asked the district court to convert the defendants' motion into one for summary judgment and permit discovery.  *See* R. 24, Pg. ID 464–65 (citing Fed. R. Civ. P. 12(d)).

The district court granted the defendants' motion.  Disclaiming reliance on material outside the pleadings, the court declined to allow discovery and treated the motion as one to dismiss.  It held that the estate's claims were conclusory allegations of unconstitutional conduct devoid of well-pled factual support.  *See* Fed. R. Civ. P. 8(a)(2).  Thus, the court dismissed the complaint.  The estate now appeals that dismissal.

II.

We review the district court's dismissal de novo and the complaint in the light most favorable to the estate. *Zakora v. Chrisman*, 44 F.4th 452, 464 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 2608 (2023).  To survive a motion to dismiss, a complaint must contain enough factual content to permit a "reasonable inference" that the defendant is liable for the alleged

---

[2]Ordinarily, courts evaluate the sufficiency of a claim based only on the four corners of the complaint. *See Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022).  But if a complaint includes attachments, the court may consider them if they are "referred to in the complaint and are central to the claims." *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015) (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)).  Because the estate's exhibits meet those requirements, we consider them with the complaint.

constitutional tort. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "Threadbare recitals of the elements of a cause of action" and "conclusory statements" won't do. *Iqbal*, 556 U.S. at 678; *see Twombly*, 550 U.S. at 555.

The estate claims the defendants violated Caraway's Eighth Amendment rights. That Amendment prohibits prison officials from "inflict[ing]" "cruel and unusual punishments." U.S. Const. amend. VIII; *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976). *But see Hudson v. McMillian*, 503 U.S. 1, 18–20 (1992) (Thomas, J., dissenting) (explaining that the Cruel and Unusual Punishments Clause historically applied "only to torturous punishments meted out by statutes or sentencing judges," not prison officials); *Rhodes v. Michigan*, 10 F.4th 665, 692–95 (6th Cir. 2021) (Thapar, J., dissenting in part). Though "inflict" is a verb of *commission*, the Supreme Court has explained that officials may also violate the Eighth Amendment by *omission*. That is, they may display "deliberate indifference" to a sufficiently serious risk of harm from which they owe an inmate protection. *Estelle*, 429 U.S. at 104; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). We've called this type of claim a "failure to protect." *See Zakora*, 44 F.4th at 469. That's what the estate alleges here. Specifically, it claims the defendants failed to protect Caraway from overdosing on fentanyl by understaffing Whiteville.

To state a failure-to-protect claim, the estate must allege facts plausibly showing two components: one objective, one subjective. We address each in turn.

A.

The objective component requires the estate to plausibly show that Caraway faced an objectively excessive risk of harm. *Farmer*, 511 U.S. at 837. According to the Supreme Court, the risk must be so grave that "society" refuses to tolerate it. *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

The estate argues Caraway faced an objectively excessive risk of overdosing. At the outset, that risk differs from the typical failure-to-protect case. Ordinarily, the risk facing the inmate is one over which prison officials have exclusive control. Because inmates can't switch cells on a whim, for example, prison officials may not expose an inmate to excessive secondhand smoke from a chain-smoking cellmate. *See Helling*, 509 U.S. at 33, 35–36. Similarly, because

inmates can't simply buy food from the grocery, prison officials may not deny them food and let them starve. *See Farmer*, 511 U.S. at 832. In each case, the inmate is unable to avoid an objectively serious risk of harm on his own. When that's the case, as the Supreme Court has told us, prison officials may not sit idly by while that harm comes to pass. *See id.* By contrast, inmates always retain the ability to choose not to take drugs and thereby avoid any risk of overdosing. Thus, the estate's claim adds a twist to the ordinary failure-to-protect theory.

We recently faced a similar claim in *Zakora v. Chrisman*. 44 F.4th 452. After Zakora overdosed in jail, his estate brought a failure-to-protect claim. *Id.* at 460–62. It argued that prison officials failed to mitigate the excessive risk of overdose presented by Zakora's access to drugs in the jail. *Id.* at 462. The district court dismissed the complaint because it failed to state a claim. *Id.* at 463–64.

We reversed in part, holding that Zakora's estate plausibly stated an objectively serious risk of harm based on Zakora's "unfettered access to deadly drugs inside a prison." *Id.* at 470–71. Three alleged facts drove that conclusion. First, the complaint contained detailed allegations about the "widespread presence of drugs" at Zakora's facility. *See id.* at 470. Second, in the two days before Zakora's overdose, two other inmates in his twelve-to-sixteen-inmate unit had also overdosed. *Id.* at 461, 471. Third, prison officials failed to investigate those overdoses. *Id.* at 461–62, 472. Taken together, those factual allegations permitted the reasonable inference that Zakora had "unfettered access to deadly drugs" in prison, creating an objectively excessive risk of overdose. *Id.* at 472. Thus, we concluded, the complaint met its failure-to-protect claim's objective component.

That conclusion was a limited one; we were careful to highlight the egregiousness of Zakora's circumstances. "[S]imple exposure to drugs," we explained, does not satisfy the objective prong. *Id.* Zakora's estate would've "ha[d] no claim" if his was a "run-of-the-mill drug-overdose case." *Id.* at 473. What set Zakora's case apart was the environment presenting "unfettered access" to deadly narcotics. *Id.* at 472.

Here, by contrast, the estate hasn't alleged that Caraway had the "unfettered access to deadly drugs" present in *Zakora*. Only one of the three key facts which made that case extraordinary is even arguably present here.

*Widespread presence of drugs.* The complaint in *Zakora* made clear that drugs were everywhere in Zakora's facility. And it included specific allegations about how the drugs got there. *See id.* at 461. Unlike *Zakora*, however, the estate here doesn't explain how the drugs got inside; it simply alleges the prison was "plagued by rampant drugs" entering the facility. *Compare* R. 18, Pg. ID 126, ¶ 96, *with Zakora*, 44 F.4th at 461 (explaining that drugs were smuggled inside basketballs thrown over the prison fence). Whether that allegation is enough to plausibly allege the widespread presence of drugs inside Whiteville is a question we need not decide, as the estate has failed to allege *Zakora*'s two other key facts.

*Two immediately prior overdoses.* The complaint in *Zakora* alleged that two other inmates in Zakora's small cell block overdosed in the two days before his death. 44 F.4th at 461. That fact, we said, "evidenced" an objectively serious risk of harm. *Id.* at 472. There's no doubt that back-to-back overdoses in a twelve-to-sixteen-person unit is a serious problem by any measure. The estate here, however, makes no such allegation. The complaint includes some broad statements about overdoses in CoreCivic facilities. *See, e.g.*, R. 18, Pg. ID 126, ¶ 96 (alleging that "all CoreCivic's private prisons" had seen "a marked increase in drug overdose deaths"); *id.*, ¶ 97 (alleging that "all CoreCivic's" facilities had seen "a dramatic increase in inmate drug use and drug overdoses"). But the mere allegation that inmates have overdosed—even at an increased rate—doesn't come close to showing the kind of excessive, one-for-every-eight risk Zakora faced. Indeed, the estate provides no detail about the magnitude of the overdose problem it alleges. Whiteville houses roughly 1,500 inmates. Framed at the estate's level of generality, we can only speculate as to how many overdoses among those inmates a "marked" and "dramatic" increase represents. Absent more detailed allegations, we can't reasonably infer an overdose problem as acute as the one in *Zakora*.

*Failure to investigate.* In *Zakora*, prison officials' failure to investigate the two overdoses in the two days before Zakora's death contributed to the risk he faced. 44 F.4th at 461, 472. Because the estate here alleged no immediately prior overdoses at Whiteville, prison

officials couldn't have failed to investigate them. The estate, again, includes some generalized allegations about the defendants' failure to respond to the alleged drug problem. *See, e.g.*, R. 18, Pg. ID 115, ¶ 51; *id.*, Pg. ID 125, ¶ 86. But those allegations are a far cry from *Zakora*'s specific, close-in-time failure.

Only one of the three key allegations in *Zakora* is arguably present here. Thus, the complaint fails to allege that Caraway faced an excessive risk of harm from unfettered access to drugs.

The estate resists this conclusion. It points to its allegation that Whiteville was understaffed. But the failure to adequately staff a prison—even a deliberate failure—is not itself a constitutional violation. *Cf. Agramonte v. Shartle*, 491 F. App'x 557, 560 (6th Cir. 2012). Perhaps recognizing that fact, the estate attempts to link understaffing to the "deprivation alleged"—the risk of overdose from unfettered access to drugs inside Whiteville. *See Farmer*, 511 U.S. at 834. It can't.

First, a word of clarification. The district court incorrectly characterized the "alleged deprivation" in this case as Caraway's death. R. 29, Pg. ID 490 n.2. And because all agreed that Caraway's death was "objectively serious," the court seemed to conclude that the estate had met its claim's objective component. *Id.* But a failure-to-protect claimant can't state an objectively excessive risk of harm by simply pointing to physical harm that occurred after the violation. Instead, "[e]ven where a serious injury occurs, the objective prong of a failure-to-protect claim requires an analysis of the risk to the injured party *before* the alleged injury occurred." *Zakora*, 44 F.4th at 469 (emphasis added). The relevant constitutional "injury" is the exposure to an objectively excessive risk, *not* any physical harm that befalls the inmate because of that risk. Thus, just as "Zakora's death from a drug overdose" didn't "independently establish the objective prong," neither does Caraway's. *Id.* at 470. Serious physical harm—even death—does not *ipso facto* satisfy a failure-to-protect claim's objective component.

That principle of constitutional injury has implications for § 1983's causation requirement in this context. As we've explained, "[t]raditional tort concepts of causation inform the causation inquiry on a § 1983 claim." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501

F.3d 592, 608 (6th Cir. 2007). That means a § 1983 plaintiff must plausibly show a causal connection between the defendant's act or omission and his injury. *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 490–91 (6th Cir. 2020). In a failure-to-protect claim, the injury is deliberate exposure to excessive risk of serious harm. Thus, the plaintiff must show that the defendants' unconstitutional act or omission failed to alleviate the excessive risk he faced. *See Zakora*, 44 F.4th at 469–70 (collecting cases). Here, that means the estate must allege facts supporting the conclusion that the defendants' understaffing caused drugs to proliferate at Whiteville.

The estate has failed to do so. The complaint contains only generalized allegations that Whiteville's understaffing "led to" rampant drug use, apparently in part because officials couldn't perform adequate head counts and inspections. That kind of conclusory statement, unaccompanied by factual support, receives no presumption of truth. *Iqbal*, 556 U.S. at 678; *see Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986). In a § 1983 claim, it's not enough to simply state that the causation requirement is satisfied; that legal conclusion must be supported by "[s]ome factual basis" showing a causal link. *Chapman*, 808 F.2d at 465. No such link is present here. The complaint, for example, never explains what inmate-inspection protocol Tennessee law requires, much less how any violation caused Caraway's overdose. The allegation that intentional understaffing caused drug proliferation at Whiteville is thus nothing more than a "the-defendant-unlawfully-harmed-me accusation," which the district court properly rejected. *Iqbal*, 556 U.S. at 678.

At best, the complaint raises the inference that new guard hires allowed the drugs to enter Whiteville. *Cf. Zakora*, 44 F.4th at 461. But that inference—to whatever extent it's a "reasonable" one—has no well-pled connection to understaffing. *Iqbal*, 556 U.S. at 678. Nor does it show more than a "mere possibility" that understaffing caused or otherwise enabled guard-facilitated smuggling. *See id.* at 679. Pleading standards demand more.

The estate's complaint fails to adequately plead an objectively serious risk of harm. That's enough to sink its Eighth-Amendment claim.

B.

Even if the estate met the objective-risk-of-harm component, it can't meet the subjective component.  That component requires the estate to allege facts permitting the reasonable inference that the defendants (1) had notice of the risk that inmates would overdose based on their unfettered access to drugs and (2) failed to reasonably respond to that risk.  *Zakora*, 44 F.4th at 472; *Farmer*, 511 U.S. at 844.  It hasn't plausibly alleged either.

*Notice of the risk*.  The estate doesn't sufficiently allege that the defendants knew of a drug problem at Whiteville.  Its complaint, to be sure, contains numerous allegations that the defendants "had knowledge" of a drug-smuggling problem at Whiteville and other CoreCivic facilities.  *See, e.g.*, R. 18, Pg. ID  114, ¶¶ 38–40; *id.*, Pg. ID 116–17, ¶ 57; *id.*, Pg. ID 117–19, ¶¶ 62–64; *id.*, Pg. ID 124–25, ¶ 83; *id.*, Pg. ID 125, ¶ 85.  But the complaint doesn't offer any factual details to support that conclusion—such as how the defendants obtained that knowledge, when they obtained it, or what that knowledge entailed.  *See Zakora*, 44 F.4th at 468.  Without more details, the allegations simply recite the subjective element of the estate's failure-to-protect-claim.  *See id.* at 473; *Iqbal*, 556 U.S. at 678.  That's not enough.

We confronted a similar problem in *Zakora*.  There, the estate "generally" alleged that the state corrections director "had notice" of a drug problem based on reports of smuggling from other facilities.  44 F.4th at 473.  But that wasn't enough to support the conclusion that the director subjectively knew Zakora faced an excessive risk of harm.  *Id.*  The estate's similarly threadbare allegations here fare no better.  In addition, like the estate in *Zakora*, Caraway's estate invokes incidents from other facilities.  *See* R. 18, Pg. ID 120–23, ¶¶ 66–75.  But those facts have nothing to do with the defendants' knowledge of a drug-smuggling problem at Whiteville.  *See Zakora*, 44 F.4th at 473.  Because those allegations weren't enough in *Zakora*, the estate's less-relevant allegations aren't enough here.

*Failure to reasonably respond*.  The estate fails to allege that officials didn't reasonably respond to the alleged risk.  According to the estate, Caraway's overdose risk stemmed from Whiteville's understaffing.  So if the defendants responded reasonably to the staffing problem—

and thus, on the estate's theory, the drug problem—we can't say they were deliberately indifferent. *See Farmer*, 511 U.S. at 844–45.

The estate's own submissions show that the defendants responded reasonably. Around the time of the 2017 audit, Whiteville had increased its officers' salaries and reworked its training program in an effort to boost its headcount. As Tennessee's Correction Department noted in response to that audit, Whiteville had "been proactive with regard to recruitment and retention, illustrated by significantly increasing staff pay." R. 18-3, Pg. ID 164. CoreCivic had also begun offering signing and relocation bonuses "as a means of resolving staff vacancies." *Id.* In addition, the 2020 audit explained that CoreCivic staffed Whiteville "in excess of the contract requirement." R. 18-4, Pg. ID 331. That audit also noted that CoreCivic facilities "had improved" staffing at "critical posts" and used a more detailed staff-monitoring system than did state-run facilities. *Id.*, Pg. ID 331, 333. Thus, it's hard to say the defendants deliberately ignored the staffing problem. Far from showing indifference, the audits indicate that CoreCivic "act[ed] reasonably" to address the shortage. *Farmer*, 511 U.S. at 845. Thus, the estate can't meet its subjective requirement.

The estate has failed to meet either requirement of its failure-to-protect claim. Accordingly, the district court correctly dismissed its complaint.

### III.

The estate seeks to impose *Monell* liability on the corporate defendants. But because the complaint doesn't allege an underlying constitutional violation, those claims fail. *See Baynes v. Cleland*, 799 F.3d 600, 622 (6th Cir. 2015).

### IV.

The estate makes two final, procedural claims. Neither succeeds.

### A.

The estate first claims that the district court violated Rule 12(d). That Rule requires district courts to "exclude[]" "matters outside the pleadings" when addressing a motion to dismiss under Rule 12(b)(6). *See* Fed. R. Civ. P. 12(d). If the court doesn't exclude them,

it must treat the motion as one for summary judgment under Rule 56. *Id.* The estate argues that the district court abused its discretion and foreclosed discovery by considering matters outside the pleadings in its 12(b)(6) ruling. *See Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010); *Mattingly v. R.J. Corman R.R. Grp.*, 90 F.4th 478, 492 (6th Cir. 2024).

Specifically, the estate takes issue with two portions of the defendants' motion to dismiss. First, the motion suggests Caraway "voluntarily" ingested the fentanyl. R. 22-1, Pg. ID 432. Second, the motion offers several theories about how drugs entered Whiteville unrelated to staffing. The estate acknowledges that the district court didn't consider those statements in granting the defendants' motion. But in the estate's view, the court should have gone further and "exclu[ded] . . . these facts from the record." Appellant Br. 33.

This argument fails for two reasons. First, the estate's premise is flawed. Offhand statements in a motion to dismiss are not "matters outside the pleadings" under Rule 12(d), much less "facts." "[M]atters" as used in Rule 12(d) refers to documents like affidavits, depositions, or transcripts. *See, e.g.*, *Clark v. Stone*, 998 F.3d 287, 296–97 (6th Cir. 2021); *see also* Fed. R. Civ. P. 56(c)(1)(A) (listing materials parties may use to support a motion for summary judgment). These documents then lay the factual foundation for a summary-judgment motion under Rule 56. Rule 12(b)(6), on the other hand, tests only the sufficiency of the *complaint's* factual allegations; "factual" statements in a motion to dismiss are not presumed true. Thus, the defendants' musings about Caraway's overdose and the drugs' path into Whiteville are exactly what the district court called them—"speculation." R. 29, Pg. ID 503.

Second, the district court expressly disclaimed any reliance on the defendants' speculation. *See id.* That disclaimer exceeded the district court's obligation under Rule 12(d). Faced with matters outside the pleadings, district courts have "complete discretion" to accept them (and treat the motion as one for summary judgment) or ignore them (and treat the motion as one to dismiss). *See* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366 (3d ed. 2024); *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). When a district court ignores such matters, nothing requires it to take the drastic step of striking them from the record. *See, e.g.*, *Zakora*, 44 F.4th at 469. Because the district

court disclaimed reliance on any extraneous matters, it properly treated the motion as one to dismiss.

B.

The estate's second procedural argument asserts that the district court erred by failing to issue a scheduling order.  Because the estate didn't make this argument below, they've forfeited it.  *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011–12 (6th Cir. 2022).  Finding neither "exceptional circumstances" nor a "plain miscarriage of justice," we decline to consider it for the first time.  *Id.* at 1012 (quotation omitted).

*     *     *

We affirm.